**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

BILLY RILEY and JOYCE RILEY                                            PLAINTIFFS

v.                                   NO. 4:05CV00729 JLH

TARGET CORPORATION                                                     DEFENDANT

## OPINION AND ORDER

Billy Riley and his wife Joyce Riley brought this personal injury action against Target Corporation for injuries that Billy Riley allegedly suffered when he tripped over cones placed on a wet floor in a Target retail store. Target has moved to exclude the expert testimony of two of Billy Riley's physicians. First, Target seeks to prevent Riley's orthopedic surgeon, Dr. James Schrantz, from testifying that Riley's hip condition, avascular necrosis, was caused by the fall at Target. Second, Target seeks to prevent Riley's family practitioner, Dr. Coleman Kent, from testifying that Riley's hip condition and knee injury were caused by the fall.

## I.

On September 11, 2004, while shopping in a Target store, Riley went into the store's concession area. A Target employee allegedly placed several "Wet Floor" cones immediately behind him. Unaware that the cones were there, Riley turned around and tripped over them, falling into a table and chair. Riley asserts that this fall caused permanent injuries to his right hip and knee.

Riley saw Dr. Kent, his family practitioner, two days after the fall, complaining of severe pain in his hip and knee. Dr. Kent examined Riley, finding contusions and swelling in Riley's hip. Dr. Kent ordered MRI (magnetic resonance imaging) scans of Riley's right hip and leg, which were done on October 19, 2004. The MRI of the hip showed signs of avascular necrosis ("AVN"), a condition

that occurs when the blood supply to the head of the femur is interrupted, resulting in death of the bone tissue.  The MRI of the knee showed that Riley had a tear of the medial meniscus, which is a part of the cartilage in the knee.  Dr. Kent then referred Riley to Dr. Schrantz.

Dr. Schrantz operated on Riley's hip on November 16, 2004.[1]  During the surgery Dr. Schrantz confirmed that Riley had AVN, which necessitated a total hip replacement.  Riley continued to have pain in his hip after the surgery, however, which Dr. Schrantz determined was caused by a problem with the prosthesis.  Dr. Schrantz thus performed a second surgery about a month later to correct the problem.  Finally, in January 2005, Dr. Schrantz operated on Riley's knee to remove the torn cartilage.

## A.      Dr. Schrantz's Testimony.

Dr. Schrantz testified in his deposition that AVN may be caused by a number of factors, including traumatic injury, alcoholism, and steroid use.  Dr. Schrantz also testified that the degree of AVN present at the time of Riley's hip replacement surgery would normally have taken 6 to 12 months from the time of onset to develop.  The time period between Riley's fall and his surgery, however, was only 66 days.  Dr. Schrantz further stated that he would not normally expect the type of hip injury sustained by Riley in the fall to cause AVN.  After considering all of the medical evidence, however, Schrantz concluded that Riley's AVN was caused by the fall at Target because Schrantz had considered and eliminated other potential causes.

On May 24, 2004, about three and a half months before Riley's fall, he had a CT (computed tomography) scan that showed his right hip.  The CT scan showed that Riley had some cystic changes

---

[1] Dr. Schrantz testified in his deposition that he performed this surgery on November 2, 2004.  This date appears to be an error, however, as Riley's medical records show that the date of the surgery was November 16, 2004.

in his hip, and cystic changes are associated with the progression of AVN. Upon reviewing this CT scan, however, Dr. Schrantz concluded that these cysts were not indicative of AVN because Riley's hip did not show any other signs of AVN, and such signs would shown up on the scan if AVN were present. Dr. Schrantz thus concluded that Riley did not have AVN when the CT scan was performed.

Dr. Schrantz considered the possible effects of alcoholism. Riley reported that he formerly had a problem with alcohol abuse, and alcohol can be a causal factor for AVN. Dr. Schrantz eliminated Riley's alcohol abuse as the cause, however, because Riley had stopped drinking about 40 years earlier. Dr. Schrantz stated that normally AVN associated with alcoholism occurs in current alcoholics and that he knows of no research showing that a distant history of alcoholism has any bearing on the development of AVN.

Dr. Schrantz also considered Riley's history of steroid use. Schrantz testified that AVN usually develops due to steroid use when the patient is a chronic steroid user and that there is normally a close time sequence between the steroid use and the AVN. One of Riley's previous physicians had prescribed a form of steroid treatment for Riley in 2003. Dr. Schrantz concluded that this steroid use did not cause Riley's AVN, however, because the dosage was very low and there was a time lapse between the steroid treatment and Riley's development of AVN.

Finally, Dr. Schrantz considered the fact that Riley's medical records showed no problems with his hip before the fall. Riley saw Dr. Kent for other medical problems during the previous month, but reported no pain or other symptoms associated with his hip. Immediately after the fall, however, Riley experienced severe pain in his hip and sought medical treatment for the problem.

Dr. Schrantz concedes that Riley's case is very unusual in that Riley's AVN developed much faster than Dr. Schrantz would have thought possible. In the medical profession, AVN is understood

3

to be a condition that progresses very slowly.  After considering all of the above factors, however, Dr. Schrantz concluded that Riley's fall at Target caused the AVN because Riley's medical history showed that it was not a preexisting condition and other potential causes had been eliminated.

**B.      Dr. Kent's Testimony.**

Dr. Kent testified that Riley's fall at Target was the cause of both his AVN and the torn meniscus in his knee.  Riley had visited Dr. Kent several times during August 2005, the month before the fall, for medical problems related to his back and hand.  Riley reported no problems with his hip or knee at that time.  After the fall at Target, as noted above, Riley saw Dr. Kent for hip and knee pain, and Dr. Kent observed contusions and swelling in Riley's hip.

Dr. Kent testified that he determined that the fall caused Riley's knee injury based on several factors.  First, Riley's medical history showed that he had no problems with the knee before his fall, and the MRI taken after the fall showed the torn cartilage.  Second, Dr. Kent testified that the sudden onset of Riley's pain indicated that the tear occurred due to trauma, not due to a degenerative process.  Third, Dr. Kent testified that to tear the meniscus, significant torque of the end of the femur would have to occur.  Finally, Dr. Kent considered the facts that Riley is in his seventies and has worked hard and that these factors can lead to degenerative changes in the knees, but compared Riley's injured knee to his uninjured one in ruling out a degenerative tear as the cause of Riley's injury.  Specifically, Dr. Kent stated that Riley's uninjured knee presents "the best control study in the world, because they have, in effect, done the same thing."  Dr. Kent admitted, however, that he did not know whether the location of Riley's tear was the most common location for a degenerative tear, whether a degenerative tear is usually horizontal or vertical, or whether a degenerative tear is usually complex as opposed to simple.  Dr. Kent also stated that he has not looked at the pictures of the tear from the

4

surgery performed by Dr. Schrantz.

Regarding Riley's hip injury, Dr. Kent testified as to his opinion that Riley's AVN was caused by the fall at Target. When asked about his knowledge of AVN, Dr. Kent testified that besides trauma, degenerative changes, and steroid use, he was unaware of other factors that could contribute to the development of AVN. He stated that he did not know whether alcohol was a contributing factor. When asked if he was properly qualified to give an opinion on this issue, Kent stated that he was qualified "only from the standpoint . . . of knowing the patient, seeing the patient multiple times, knowing what he was before, and then seeing what he was after." Dr. Kent gave no other testimony as to how he reached his conclusion that Riley's AVN was caused by the fall.

## II.

Target argues that the proffered testimony fails to meet the requirements of Federal Rule of Evidence 702, as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, the court must ensure that a proffered expert is qualified by his knowledge, skill, experience, training, or education before that person may testify as an expert. Besides examining a proffered expert's qualifications, the Supreme Court stated in *Daubert* that the trial judge also has a gatekeeping responsibility to ensure that expert evidence is both relevant and reliable before admitting it. *Daubert*, 509 U.S. at 589, 113 S. Ct. at 2795; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141,

119 S. Ct. 1167, 1171, 143 L. Ed. 2d 238 (1999). Regarding relevancy, the Supreme Court stated that

Rule 702 requires the proffered expert testimony to relate to an issue in the case and also to be

sufficiently tied to the facts of the case, i.e., that the expert testimony "fit." *Daubert*, 509 U.S. at 591,

113 S. Ct. at 2795-96; *see also Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 694 (8th Cir. 2001). As

to reliability, the Supreme Court stated that the inquiry envisioned by Rule 702 is a "flexible one."

*Daubert*, 509 U.S. at 594, 113 S. Ct. at 2797. The inquiry should focus on the principles and

methodology the expert uses and not on the conclusions generated. *Id*. at 595, 113 S. Ct. at 2797.

The *Daubert* Court gave four factors that should guide a district court's analysis: (1) whether the

theory can be or has been tested; (2) whether the theory has been subjected to peer review and

publication; (3) what the known or potential rate of error is; and (4) whether the theory has received

"general acceptance" in the relevant scientific community. *Id*. at 593-94, 113 S. Ct. at 2796-97. The

Court noted that many factors will bear on the inquiry and that the four factors given above should

not be taken as a "definitive checklist or test." *Id*. at 593, 113 S. Ct. at 2796; *Kumho Tire*, 526 U.S.

at 141-42, 119 S. Ct. at 1171. In addition to the four factors explicitly listed by the Supreme Court

in *Daubert*, courts after *Daubert* have noted additional relevant factors, including "whether the

expertise was developed for litigation or naturally flowed from the expert's research; whether the

proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently

connected the proposed testimony with the facts of the case." *Lauzon*, 270 F.3d at 687 (citing cases).

The trial court's role is not to determine whether an expert's opinion is correct; it is an expert

witness's methodology, rather than his conclusions, that is the primary concern of Rule 702. *Bonner*

*v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001). "'[E]ven if the judge believes there are better

grounds for some alternative conclusion, and that there are some flaws in the scientist's methods, if

there are good grounds for the expert's conclusion it should be admitted . . . .'" *Id.* (quoting *Heller v. Shaw Indus.*, 167 F.3d 146, 152-53 (3d Cir. 1999)).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798.

"Rule 702 favors admissibility if the testimony will assist the trier of fact, and doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998) (citation and quotation omitted). "Only if an expert's opinion is 'so fundamentally unsupported that it can offer no assistance to the jury' must such testimony be excluded." *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) (quoting *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988)).

## A.      Admissibility of Dr. Schrantz's Testimony.

Target asserts that Dr. Schrantz's reasoning is flawed and his testimony thus inadmissible. Specifically, Target argues that Dr. Schrantz ignored several potential factors that could have caused Riley's AVN and that his conclusion is contrary to the literature on the rate of development of AVN. Riley contends that Dr. Schrantz reached his conclusion by using the method of differential diagnosis, which is a scientifically reliable method employed in the medical profession.

The process of differential diagnosis involves "ruling in" all scientifically plausible causes of the plaintiff's injury, then "ruling out" the least plausible causes of injury until the most likely cause is identified. *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). The final result of a differential diagnosis is the expert's conclusion as to what caused the injury. *Id.* "[D]ifferential diagnosis is a tested methodology, has been subjected to peer review/publication, does not frequently lead to incorrect results, and is generally accepted in the medical community." *Turner v. Iowa Fire*

*Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000).  Thus, "a medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy *Daubert*."  *Id.*

Although Dr. Schrantz did not use the term "differential diagnosis" in deposition, his explanation of the reasons for his opinion shows that he employed this method.  Dr. Schrantz considered numerous factors that can potentially contribute to the development of AVN and, upon considering Riley's medical history and the events leading up to his hip surgery, eliminated everything except Riley's fall as the cause of his AVN.  Target's assertion that Dr. Schrantz ignored Riley's previous alcohol and steroid use and the cysts in Riley's hip is baseless.  Dr. Schrantz stated that he considered each of these factors and explained why he ruled them out.  Dr. Schrantz concedes that he would generally consider the type of injury that Riley sustained in the fall, which involved swelling and contusions but no fracture or dislocation of the hip, unlikely to result in AVN.  Dr. Schrantz concluded that the fall caused Riley's AVN, however, because he considered the other potential causal factors even less likely to have caused the disorder.  Given Dr. Schrantz's explanation of the factors that he considered and his reasons for eliminating them, the Court cannot say that his reasoning and methodology were so fundamentally flawed as to render his opinion inadmissible.

Dr. Schrantz also concedes that his conclusion that Riley's AVN developed in the relatively short period of time between the fall and the hip replacement runs counter to the medical profession's understanding of AVN's normal progression and that he knows of no literature or published studies showing that such rapid development is possible.  These weaknesses in Dr. Schrantz's conclusion do not render his testimony inadmissible.  "There is no requirement 'that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness.'"  *Bonner*, 259 F.3d at 929 (quoting *Heller*, 167 F.3d at 152-53).  "Likewise, there

8

is no requirement that published epidemiological studies supporting an expert's opinion exist in order for the opinion to be admissible." *Id.* Faults in an expert's use of differential etiology as a methodology or lack of textual authority for his opinion go to the weight, not the admissibility, of his testimony. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). A district court may not exclude scientific testimony simply because the conclusion is "novel" if the methodology and reasoning are reliable. *Bonner*, 259 F.3d at 929.

The essence of Target's argument is that Dr. Schrantz's conclusion is necessarily wrong because he failed to weigh the potential causal factors as Target believes they should have been weighed and because the common medical understanding of AVN is that it develops slowly. Target will have the opportunity to cross-examine Dr. Schrantz on these issues at trial, and the finder of fact may conclude that Dr. Schrantz's testimony is not persuasive, but Target's criticisms go to the weight of Dr. Schrantz's testimony, not its admissibility.

## B.     Admissibility of Dr. Kent's Testimony.

Target seeks to exclude Dr. Kent's testimony as to the cause of Riley's AVN and torn meniscus on the ground that Dr. Kent is not qualified to express an opinion on these issues. The basis of Target's argument is that Dr. Kent is not an orthopedic specialist and that he stated that he would defer to Dr. Schrantz's opinion as to the cause of Riley's injuries. The Court agrees that Dr. Kent is not qualified to offer an opinion as to the cause of Riley's AVN, but holds that he is qualified to testify as to the cause of Riley's knee injury.

A "proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline." *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24 (1st Cir. 2003). Knee injuries are a common problem that

family practitioners such as Dr. Kent see in their medical practices, and Dr. Kent has specialized knowledge on this subject that would be helpful to a jury, regardless of the fact that he is not an orthopedic specialist.  Dr. Kent testified that he based his opinion as to the cause of Riley's torn meniscus upon his personal knowledge of Riley's medical condition and history and the information he received following Riley's MRIs and subsequent surgery.  Physicians such as Dr. Kent routinely rely upon other physicians or specialists in the course of treating patients with various medical problems.  Dr. Kent's unfamiliarity with certain aspects of this type of knee injury and his deference to Dr. Schrantz's opinion go to the weight, not the admissibility, of his testimony.

AVN, however, is not a common condition and the undisputed testimony shows that it can be caused by a wide variety of factors.  Dr. Kent testified that he is unfamiliar with some of these factors and that his qualifications for testifying as to the cause of Riley's AVN were limited to his having seen Riley before and after the fall at Target.  Accordingly, Dr. Kent's opinion testimony regarding the cause of Riley's AVN is inadmissible.

Dr. Kent may testify, however, as to his personal knowledge of Riley's medical condition, including the condition of his hip.  As Riley's treating physician, Dr. Kent has first-hand knowledge of Riley's medical history before the fall at Target and his injury following this incident that is relevant and may be considered by the jury.

## CONCLUSION

Applying Rule 702 and *Daubert* in this case, this Court finds that Dr. Schrantz's opinion testimony as to the cause of Riley's AVN meets the threshold requirements of relevance and reliability, and is therefore admissible.  Target's motion in limine regarding the testimony of Dr. Schrantz (Document # 9) is DENIED.  The Court further finds that Dr. Kent is qualified to offer

opinion testimony as to the cause of Riley's torn meniscus, and his testimony on this issue is admissible.  Dr. Kent is not qualified to testify as to the cause of Riley's AVN, however, and his testimony relevant to the condition of Riley's hip is thus limited to his personal knowledge of Riley's medical condition.  Target's motion in limine concerning the testimony of Dr. Kent (Document # 11) is therefore GRANTED in part and DENIED in part.

IT IS SO ORDERED this 13th day of April, 2006.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE